## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TORRIANA CLARK**                                    CIVIL ACTION

**VERSUS**                                                        No. 23-6293

**LANCE WALLACE ET AL.**                          SECTION I

### ORDER & REASONS

Before the Court is a motion[1] for summary judgment filed by defendants Sergeant Lance Wallace ("Wallace"), Warden Travis Day, and the State of Louisiana though the Department of Public Safety and Corrections (collectively, "defendants"). Plaintiff Torriana Clark ("Clark")[2] opposes the motion.[3] Defendants filed a reply.[4] For the reasons set forth below, the Court grants the motion for summary judgment in part and denies it in part.

### I.    BACKGROUND

#### a.    Procedural History

Clark is a Louisiana state prisoner presently incarcerated at the Rayburn Correctional Center ("RCC") in Washington Parish, Louisiana.[5] Clark initially filed the instant lawsuit in state court on September 5, 2023.[6] Clark's petition asserts a federal § 1983 claim and various state-law tort claims against defendants arising

---

[1] R. Doc. No. 18.
[2] The Court notes that Clark's first name is spelled "Torriana" on the complaint, but "Torriano" on subsequent filings, including certain exhibits and portions of Clark's opposition.
[3] R. Doc. No. 20.
[4] R. Doc. No. 21.
[5] R. Doc. No. 2-1 (state-court petition), ¶ 3.
[6] *See generally id.*

from a July 29, 2021 incident at RCC.[7] On October 18, 2023, defendants removed the action to this Court, invoking federal question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).[8]

During a telephone status conference held on January 23, 2024, counsel for defendants indicated that he believed Clark's claims were barred pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994).[9] The Court ordered Clark's counsel to advise the Court whether she agreed that Clark's claims were *Heck*-barred after reviewing information related to Clark's prison disciplinary hearing and consulting with Clark.[10] Clark subsequently filed a motion for a briefing schedule and a stay during adjudication.[11] In that motion, Clark requested a briefing schedule on the applicability of *Heck* and also suggested that any forthcoming motion from defendants on relevant qualified immunity issues "should be heard as a preliminary matter."[12] The Court held a second telephone conference, this time on the issues raised in Clark's motion.[13] During the conference, the Court granted Clark's motion to the extent it sought a briefing schedule on the applicability of *Heck*, but denied the motion in all other respects.[14]

---

[7] *Id.* ¶¶ 30–38; 4–5.

[8] R. Doc. No. 2, ¶¶ 2–3.

[9] *See* R. Doc. No. 15.

[10] *Id.* at 1.

[11] R. Doc. No. 16.

[12] *Id.* at 1.

[13] R. Doc. No. 17.

[14] *Id.* at 1. In his response to the motion for summary judgment, Clark objects to "the lack of immediate briefing on the issue of qualified immunity[.]" R. Doc. No. 20, at 2. Clark also suggests that, on page 9 of defendants' motion, "[d]efendants agree that [*Heck*] is not jurisdictional and infer [sic] that this Court erred in failing to order

### b.   Clark's Petition

Clark's petition alleges that Clark was "working in the Sleet Yard when he began to feel very badly and became weak and reported . . . that he needed to see a

---

briefing on qualified immunity." *Id.* at 1 n.1. The Court finds nothing in defendants' memorandum suggesting that defendants believe the Court erred in declining to order briefing on qualified immunity at this stage of the litigation. The cases Clark relies on to support his position that this Court erred in declining to order immediate briefing on qualified immunity are inapposite. *See id.* at 22. In *Ramirez v. Guadarrama*, the U.S. Court of Appeals for the Fifth Circuit explained the well-settled principle that "a denial of qualified immunity is immediately appealable and that a defendant's entitlement to qualified immunity should be determined at the earliest possible stage of the litigation." 3 F.4th 129, 133 (5th Cir. 2021). However, *Ramirez* does not mandate that qualified immunity issues be considered before *Heck* issues; indeed, it does not even mention *Heck*. *See generally id.* In *Armstrong v. Ashley*, the Fifth Circuit again explained that "[a] decision on qualified immunity can be an appealable final decision." 918 F.3d 419, 422 (5th Cir. 2019). However, the *Armstrong* court ultimately dismissed the appeal for lack of appellate jurisdiction because the district court's denial of defendants' Rule 12(b)(6) motion to dismiss based on qualified immunity was made on procedural grounds rather than legal grounds and "nothing in the district court's order bar[red] [the defendants] from asserting qualified immunity by appropriate, timely procedural vehicle in the future." *Id.* at 423. In the instant case, as in *Armstrong*, nothing in the record prevents defendants from asserting qualified immunity by an appropriate, timely procedural vehicle in the future. In *Autin v. Goings*, the Fifth Circuit explained that the district court had declined to rule on qualified immunity when it was obligated to do so because the district court had denied a motion for summary judgment based on *Heck* and refused to consider qualified immunity as an alternative bar. No. 21-30678, 2023 WL 3004142, at *2 (5th Cir. Apr. 19, 2023). The Fifth Circuit held that the district court had abused its discretion by holding that Autin's claims were not *Heck*-barred, but stated: "because *Heck* plainly requires dismissal of Autin's claims, we need not reach the question of qualified immunity." *Id.* at *4. This case actually *supports* the Court's view that, if it finds Clark's claims to be *Heck*-barred, it need not reach the issue of qualified immunity. *See also, e.g.*, *Connors v. Graves*, 538 F.3d 373, 378 (5th Cir. 2008) (affirming district court's dismissal, which was based on qualified immunity, but determining that *Heck* barred the complaint such that the court did not need to address the issue of qualified immunity); *McNeal v. LeBlanc*, 90 F.4th 425, 430–31 (5th Cir. 2024) (addressing *Heck* before qualified immunity).

doctor."[15] An officer told Clark to wait until the officer was "freed up [from] his duties."[16] Clark tried to eat and drink "but felt even worse as though he was unsteady on his feet. He tried to approach his bunk to lie down and he developed a sever[e] headache."[17] Later, when an officer was making rounds, Clark "got out of his bed to seek help, but fell due to weakness, nausea, and dizziness."[18] He again informed the officer that he needed to see a doctor.[19]

According to the petition, Clark then "tried to sit down on a bed and [the] [o]fficer grabbed him and forced him against the wall."[20] Clark was handcuffed, and he "tried to explain that he was sick, weak[,] and could not walk."[21] Other officers then arrived to assist with escorting Clark out of the dormitory.[22] One of those officers allegedly "threw him on a bed."[23] "At that point, [ ] Wallace [ ] started twisting his ankle. [ ] Wallace began choking [Clark] who was in full restraints, had an injured ankle[,] and who was unable to defend himself."[24] Clark claims that he "blacked out

---

[15] R. Doc. No. 2-1, ¶ 8. The Court notes that Clark's Administrative Remedy Procedure claim states that, while outside, Clark picked up what he thought was a cigarette and "smoked the rest of it." R. Doc. No. 18-4, at 14. Clark asserts that this was not the same cigarette he had been smoking earlier, and he began to feel lightheaded soon after smoking it. *Id.*

[16] R. Doc. No. 2-1, ¶ 8.

[17] *Id.* ¶ 9.

[18] *Id.* ¶ 10.

[19] *Id.*

[20] *Id.* ¶ 11.

[21] *Id.*

[22] *Id.* ¶ 12.

[23] *Id.*

[24] *Id.*

briefly due to being choked" and was dragged out of the dormitory.[25] Wallace allegedly pushed him, saying, "Walk faster, before I make you walk!"[26]

The petition asserts that, because Clark was having difficulty walking due to his illness and ankle pain, Wallace forced him to the ground.[27] When Clark regained consciousness, "there was blood on the ground and he could feel blood running down his face, which felt numb[.]"[28] Clark was "not able to breathe from his nose."[29] Clark then "started crying and [ ] asking why," but Wallace grabbed his arm and began jerking him up while using profanity to instruct Clark to "walk" before Wallace "[did] it again[.]"[30] Clark was taken to the hospital that day.[31] He received four to five stitches in his forehead and it was determined that his ankle and nose were injured.[32]

The petition alleges that, although Wallace "has a history of using excessive force on RCC inmates with multiple complaints being filed on him[,] nothing has been done to discipline him" because "he is protected and not held responsible for his actions due to family connections."[33] The petition further alleges that "rampant nepotism and cronyism at RCC prevent any real order and discipline of the officers" and that the warden and Department of Corrections are "well aware" of this.[34] The

---

[25] *Id.* ¶ 13.

[26] *Id.*

[27] *Id.* ¶¶ 14–15.

[28] *Id.* ¶ 15.

[29] *Id.*

[30] *Id.* ¶ 16.

[31] *Id.* ¶ 18.

[32] *Id.* ¶ 20.

[33] *Id.* ¶¶ 17, 26.

[34] *Id.* ¶ 19.

petition also asserts that "Medical frequently fails to document and/or treat injuries to inmates caused by guards[.]"[35] Additionally, according to the petition, the warden, Travis Day, "was negligent in his supervision and training of [ ] Wallace and the other correctional officers and instilled and allowed an atmosphere of violence between guards and inmates[,]" including by ignoring reports of assaults.[36]

Based on these allegations, Clark asserts a § 1983 claim and several state-law tort claims against defendants, including battery, negligence, and intentional infliction of emotional distress.[37]

### c.  Clark's Disciplinary Hearing and Defendants' Versions of the July 29, 2021 Incident

Three disciplinary reports arose from this incident.[38] The first is a disciplinary report signed by Wallace.[39] Wallace describes the July 29, 2021 incident from his perspective, including his use of force.[40] Wallace asserts that he responded to a beeper activation and observed Clark "being combative [and] refusing to be restrained."[41] According to Wallace, he "began giving multiple orders to stop resisting."[42] Clark was then "directed to a [nearby] bed due to his resistance and combative behavior."[43] At

---

[35] *Id.* ¶ 22.
[36] *Id.* ¶ 24.
[37] *Id.* ¶¶ 30–37.
[38] The Court notes that it may consider the disciplinary reports because they were submitted "to demonstrate that the disciplinary board found [Clark] guilty of various offenses, not to prove the truth of the matter, that is, that he actually had committed the offenses." *Santos v. White*, 18 F.4th 472, 477 (5th Cir. 2021).
[39] R. Doc. No. 18-3, at 2–4.
[40] *Id.* at 2.
[41] *Id.*
[42] *Id.*
[43] *Id.*

6

this point, Wallace states that he "placed [his] right hand on [Clark's] right shoulder applying downward pressure while giving multiple orders to stop resisting."[44] While applying this downward pressure, Wallace "observed [Clark] start kicking his legs."[45]

"[T]o prevent [Clark] from harming himself and assaulting staff, [Wallace states that he] stopped applying downward pressure to [Clark's] right shoulder and redirected [his] positioning to [Clark's] legs while giving multiple orders to stop resisting and kicking which [Clark] refused."[46] Because Clark was "continuing to kick," Wallace "took control of his right ankle[,] applying an ankle lock while giving orders to stop kicking and resisting."[47] Wallace asserts that Clark then "reluctantly began to comply with orders to stop resisting" and that "pressure was released on [ ] Clark's ankle."[48]

According to the report, "Act/Major" Darren Ball ("Ball") advised the officers that Clark should be escorted out of the dormitory.[49] Wallace "then released [ ] Clark's ankle" and "Clark was then assisted to his feet."[50] Once Clark was helped to his feet, "he began jumping up and down while twisting his body being combative."[51] Wallace asserts that Clark "was given multiple orders to stop resisting[,]" but he refused.[52] Wallace states that he "took control of [ ] Clark's upper torso[,] directing him to a

---

[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*

nearby bed" and that "Clark was then directed to the floor."[53] "Once on the floor, [ ] Clark continued his combative behavior and resistance."[54] According to Wallace, he "took control of [ ] Clark's upper torso applying downward pressure while giving multiple orders to stop resisting."[55] "Moments later, [ ] Clark reluctantly began to comply with orders to stop resisting" and "was assisted to his feet."[56]

The report states that Wallace and Ball placed Clark in "an off-balance escort position to escort him out of the dormitory while giving multiple orders to walk to no avail."[57] Upon entering the television room, Wallace asserts that "Clark was assisted to the floor to reestablish the escort position."[58] Clark stated that he would walk.[59] "Clark was then assisted to his feet and hands on escorted out of the dormitory. Once out of the dormitory, [ ] Clark stopped walking and began hollering, 'Time for [y'all] to feel my pain I go through[.]'"[60] According to Wallace, Clark was ordered to walk "to no avail."[61] Ball and Wallace then "directed Clark to the ground while giving multiple orders to stop resisting."[62] "Once on the floor, [ ] Clark reluctantly began to comply with orders" and "stated that he would walk."[63] Wallace states that "Clark was then

---

[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*

assisted to his feet and hands on escorted to the infirmary [without] any further incident. All use of force ceased."[64]

This first disciplinary report does not clearly indicate whether Clark pleaded guilty to the violations of Rule 3 (defiance) and Rule 5 (aggravated disobedience) described in the report or whether he was found guilty.[65] However, the disciplinary board sentenced Clark to a 30-day disciplinary transfer for the Rule 3 violation and a 60-day disciplinary transfer for the Rule 5 violation.[66]

The second disciplinary report is signed by Lieutenant Brian Nichols ("Nichols").[67] Like Wallace, Nichols describes the July 29, 2021 incident from his perspective.[68] Specifically, Nichols asserts that he responded to a beeper activation and observed Clark being combative with Cadet Christopher Kimball ("Kimball").[69] Nichols states that he gave "loud, direct orders to stop resisting . . . to no avail."[70] He then applied handcuffs to Clark and "attempted to escort [him] out of the dorm when he continued to resist by [tensing] up his upper torso."[71] Nichols directed Clark to the bed and "continued to give orders to stop resisting."[72] "Shortly afterwards[,] [ ] Clark began to comply with orders and [Nichols] released [ ] Clark's upper torso. At this

---

[64] *Id.*

[65] *Id.* (showing that numbers 18—"plea by offender"—and 19—"rule/verdict"—were left blank).

[66] *Id.* at 3.

[67] *Id.* at 5–6.

[68] *Id.* at 5.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

point, all use of force ceased."[73] This disciplinary report indicates that Clark pleaded guilty to violations of Rule 3 (defiance) and Rule 5 (aggravated disobedience).[74] Clark's sentence was a loss of 60 days of good time credit for each violation.[75] The disciplinary board also imposed $24.00 in restitution for exams following the use of force.[76]

The third disciplinary report is signed by Ball and it indicates that Clark pleaded guilty to a violation of Rule 14 (intoxication).[77] The parties appear to agree that this disciplinary report is not relevant to the *Heck* analysis that follows.[78]

### d. Video Recordings of the July 29, 2021 Incident

Defendants submitted three video recordings in support of their motion for summary judgment.[79] The first video is from a camera in the prison dormitory.[80] Kimball enters the room and stops to talk to Clark, the man sitting next to him, or possibly both of them.[81] Kimball then leaves the men and continues walking through the dormitory.[82] As Kimball approaches the camera, Clark stands up, raises his

---

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.* at 7–8.

[78] *See* R. Doc. No. 20, at 4 (stating that the disciplinary report for intoxication "has no relevance"); *see generally* R. Doc. No. 18-2 (arguing that Clark's claims are *Heck*-barred based on the Nichols report for which Clark lost good-time credit, not based on the report concerning Clark's intoxication).

[79] *See* R. Doc. No. 18-5 (notice of manual attachment); R. Doc. No. 19 (notice that manual attachment is located in the Clerk's Office).

[80] *See generally* Manual Attachment No. 1.

[81] *Id.* at 0:08–0:32.

[82] *Id.* at 0:32–1:01.

hands to his head, and walks over toward Kimball while jumping up and down.[83] Clark falls to the ground and then stands up again.[84] He walks closer to Kimball, moving his arms.[85] When he arrives at the walkway between the rows of beds where Kimball is standing, he approaches Kimball, then takes a step back, places his hands behind his back, and speaks to Kimball.[86] Clark takes a few steps toward Kimball, places his back against a bunk bed, and begins jumping up and down again.[87]

Kimball reaches for Clark's left arm, but Clark pulls away and falls against another bunk bed.[88] At this point, Kimball physically guides Clark between two bunk beds and toward the wall.[89] Clark appears to be resisting and pulling away from Kimball.[90] Another man who had been sitting on one of the adjacent bunk beds stands up and moves away.[91] A second officer enters the room.[92] She rushes over to Clark and Kimball and helps Kimball push Clark against the wall.[93] A third officer, Nichols, enters and moves quickly toward the two guards and Clark.[94] The three officers

---

[83] *Id.* at 1:00–1:07.
[84] *Id.* at 1:07–1:15.
[85] *Id.* at 1:15–1:20.
[86] *Id.* at 1:20–1:30.
[87] *Id.* at 1:30–1:36.
[88] *Id.* at 1:36–1:42.
[89] *Id.* at 1:42–2:07.
[90] *Id.*
[91] *Id.* at 1:48–1:52.
[92] *Id.* at 2:07.
[93] *Id.* at 2:07–2:14.
[94] *Id.* at 2:13–2:21.

attempt to handcuff Clark, and there appears to be a struggle.[95] A fourth and fifth officer arrive.[96] The fifth officer, Wallace, helps the other officers handcuff Clark.[97]

Once Clark is handcuffed, the officers move him away from the space between the two bunk beds and force him onto a different bed.[98] Nichols appears to place his knee on Clark's back.[99] Wallace is standing on the other side of the bed, near Clark's head.[100] Clark kicks his legs.[101] Wallace walks around the bed to position himself closer to Clark's feet.[102] Wallace grabs Clark's foot and lifts it up.[103] The man previously lying on the adjacent bed stands up and moves away.[104] Nichols still seems to be kneeling on Clark's back, and another officer standing to the left of Nichols and Wallace is pressing down on Clark.[105]

Wallace twists Clark's leg and presses it down toward the ground.[106] Wallace then sits on the adjacent bed, still holding one of Clark's legs.[107] The video also shows Kimball holding Clark's other foot.[108] Another officer enters and appears to say

---

[95] *Id.* at 2:21–2:38.
[96] *Id.* at 2:24–2:42.
[97] *Id.* at 2:40–2:52.
[98] *Id.* at 2:50–2:57.
[99] *Id.* at 2:59–3:58.
[100] *Id.*
[101] *Id.* at 2:57–3:10.
[102] *Id.* at 3:10–3:14.
[103] *Id.* at 3:12–3:16.
[104] *Id.* at 3:13–3:26.
[105] *Id.* at 3:12–3:23.
[106] *Id.* at 3:13–3:34.
[107] *Id.* at 3:34–3:47.
[108] *Id.* at 3:25–4:05.

something to the group.[109] The video shows Wallace leaning forward.[110] Since his back is to the camera, it is not entirely clear what he is doing when he leans forward, but he may be applying additional pressure to Clark's leg.[111] The guard who most recently entered walks around the bed toward Clark's head.[112] Shortly after this guard arrives, Nichols stops applying pressure and stands.[113] A few seconds later, Wallace drops Clark's leg and Wallace stands.[114] Several officers help Clark stand.[115] As soon as he is standing, Clark jumps, which seems to cause him and several officers to fall backward onto the adjacent bed.[116] When they fall onto the bed, the video shows Wallace's arm around Clark's neck, with Clark on top of Wallace kicking his legs.[117] The other officers rush toward the bed and pull Clark off the bed and onto the floor.[118] A group of officers huddles around Clark, with some officers kneeling and others standing.[119] Wallace appears to be on top of Clark and near his head applying pressure.[120] Two other officers arrive with leg shackles.[121] Once the leg shackles are

---

[109] *Id.* at 3:40–3:49.
[110] *Id.* at 3:38–4:03.
[111] *See id.*
[112] *Id.* at 3:45–3:57.
[113] *Id.* at 3:58.
[114] *Id.* at 4:01–4:03.
[115] *Id.* at 4:03–4:05.
[116] *Id.* at 4:04–4:09.
[117] Id. at 4:06–4:10.
[118] *Id.* at 4:07–4:21.
[119] *Id.* at 4:21–5:07.
[120] Id. at 4:18–5:05.
[121] *Id.* at 5:06–5:13.

applied, the officers again attempt to bring Clark to his feet.[122] The officers pull Clark out of the dormitory with his feet dragging on the ground.[123]

The second video shows the television room outside the dormitory area.[124] The officers and Clark enter the room and stop near the entrance.[125] The officers are still dragging Clark.[126] The officers then appear to place Clark on the floor and reposition themselves.[127] Several of the men sitting in the television room stand and watch.[128] The officers and Clark then walk across the room toward the exit, with Clark walking rather than being dragged by the officers.[129]

The third video shows officers escorting Clark to the infirmary.[130] Clark is still walking in this video.[131]

## II.   STANDARD OF LAW

Summary judgment is proper when, after reviewing the materials in the record, a court determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record]

---

[122] *Id.* at 5:13–6:26.
[123] *Id.* at 6:26–6:40.
[124] *See generally* Manual Attachment No. 2.
[125] *Id.* at 0:43–1:02.
[126] *Id.* at 0:43–0:47.
[127] *Id.* at 0:47–1:02.
[128] *Id.* at 0:57.
[129] *Id.* at 1:02–1:18.
[130] Manual Attachment No. 3, at 0:21–0:36.
[131] *Id.*

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case. *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the movant's story is "blatantly contradicted by the record"—including a videotape—such that "no reasonable jury could believe it," the court should "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). If the nonmovant fails to meet its burden of showing a genuine issue for

15

trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075–76.

The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

### III.   ANALYSIS

As noted, defendants argue that they are entitled to summary judgment because Clark's federal § 1983 claim and his state-law claims are *Heck*-barred. Clark disagrees. For the reasons that follow, the Court concludes that Clark's § 1983 claim is *Heck*-barred. The Court also declines to exercise supplemental jurisdiction over Clark's state-law claims.

### a.   The *Heck* Standard

In *Heck,* a state prisoner convicted of voluntary manslaughter filed a federal civil lawsuit against prosecutors and a police investigator pursuant to 42 U.S.C. § 1983. 512 U.S. at 478–79. The complaint alleged that the defendants had engaged in an unlawful, unreasonable, and arbitrary investigation leading to the plaintiff's arrest, knowingly destroyed exculpatory evidence, and caused an illegal voice identification procedure to be used at the plaintiff's trial. *Id.* at 479. Citing the "principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments[,]" the U.S. Supreme Court held that,

16

> in order to recover damages for allegedly unconstitutional conviction or
> imprisonment, or for other harm caused by actions whose unlawfulness
> would render a conviction or sentence invalid, a § 1983 plaintiff must
> prove that the conviction or sentence has been reversed on direct appeal,
> expunged by executive order, declared invalid by a state tribunal
> authorized to make such determination, or called into question by a
> federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Id.* at 486–87.

The Supreme Court further explained that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence[.]" *Id.* at 487. If so, "the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* *Heck* also prohibits § 1983 lawsuits if success on the § 1983 claim would necessarily imply that a prior disciplinary proceeding resulting in a change to the prisoner's sentence—including the loss of good time credits—is invalid. *Aucoin v. Cupil*, 958 F.3d 379, 382 (5th Cir. 2020).

The *Heck* doctrine is motivated by the principle that courts "do not allow the use of § 1983 to collaterally attack a prior criminal proceeding [or disciplinary proceeding resulting in the loss of good time credits], out of concern for finality and consistency." *Id.* at 380–81. Specifically, "courts are wary of duplicative litigation and the potential for conflicting judgments." *Id.* at 382. "[I]f an individual objects to the results of a prior proceeding, the proper avenue for relief is an authorized appeal in that proceeding—not an end-run through § 1983." *Id.*

Accordingly, a prisoner "cannot bring a § 1983 claim for excessive use of force by a prison guard, if the inmate has already been found guilty for misconduct that

justified that use of force." *Aucoin*, 958 F.3d at 381. "But *Heck* does not bar a § 1983 claim for a prison guard's excessive use of force *after* the inmate has submitted and ceased engaging in the alleged misconduct." *Id.* (emphasis in original).

Determining "whether an individual claim is barred by *Heck* is . . . 'analytical and fact-intensive.'" *Gray v. White*, 18 F.4th 463, 468 (5th Cir. 2021) (quoting *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008)). "A court may bar only those claims whose success 'require[] negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction.'" *Id.* (quoting *Bush*, 513 F.3d at 497). One hallmark of a non-*Heck*-barred claim is "if the factual basis for the conviction is temporally and conceptually distinct" from the civil claim. *Bush*, 513 F.3d at 498.

But the *Heck* bar extends further: even where the plaintiff's "*factual allegations* supporting the claim are necessarily inconsistent with the validity of the conviction," *Heck* still bars the claim. *Aucoin*, 958 F.3d at 383 (citing *Bush*, 513 F.3d at 497; *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 656–57 (5th Cir. 2007)). That is true regardless of a civil claim's "theoretical compatibility" with the conviction. *Daigre v. City of Waveland*, 549 F. App'x 283, 286 (5th Cir. 2013) (quoting *Bush*, 513 F.3d at 498 n.14); *see also Thomas v. Pohlmann*, 681 F. App'x 401, 407 (5th Cir. 2017) (citing with approval *Daigre* and *DeLeon*).

To lift a *Heck* bar, the plaintiff bears the burden of proving that the proceedings terminated in his favor. *See Hoog-Watson v. Guadalupe Cnty.*, 591 F.3d 431, 435 (5th Cir. 2009). Absent such a showing, a *Heck*-barred claim should be "dismissed with

prejudice to [its] being asserted again until the *Heck* conditions are met." *DeLeon*, 488 F.3d at 657 (quoting *Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir. 1996)).

## b.    Federal Claims

Defendants argue that Clark's § 1983 claim is *Heck*-barred because that claim requires Clark to assert facts contrary to those underlying his convictions for the Rule 5 and Rule 14 violations.[132] Defendants note that Clark's claim "is not that the officers used excessive force after he stopped resisting or to stop his resistance; instead his claim is based on assertions that he was ill and was only trying to seek help from the officer on duty, while several other officers, including [ ] Wallace, suddenly began using excessive force without provocation."[133] Defendants further contend that the Nichols report "squarely supports [Clark's] conviction[s] [for defiance and aggravated disobedience] in that [Clark] disobeyed direct orders and offered resistance to officers attempting to gain compliance."[134] Additionally, defendants argue that "the video footage plainly shows that [Clark's] claims arise out of one continuous incident. There are no allegations in [Clark's] civil claim that are temporally and/or conceptually distinct from the factual basis upon which his convictions were based."[135]

Clark responds that the Nichols report and Wallace reports must be considered separately.[136] Since Clark only lost good time credit for the conduct described in the Nichols report, he asserts that *Heck* does not apply to conduct not covered by that

---

[132] R. Doc. No. 18-2, at 10–15.
[133] *Id.* at 10.
[134] *Id.* at 12.
[135] *Id.*
[136] R. Doc. No. 20, at 2.

report, conduct that occurred after the conduct for which Clark lost good time, and conduct that occurred while Clark was no longer resisting.[137] According to Clark, the Nichols report ends when Nichols released Clark and Clark was no longer resisting.[138] Clark therefore argues that "the conduct for which Clark lost good time is limited to the struggle at the wall during hand-cuffing, a short struggle on the bed" because "there are no disciplinary charges by Nichols for any conduct that took place after Nichols released Clark, which is clearly visible on the video, or conduct by Wallace in nearly breaking Clark's leg."[139]

Clark correctly asserts that the fact that these two reports are "intertwined" is insufficient to support a holding that conduct not described by the Nichols report is *Heck*-barred.[140] *See Gray*, 18 F.4th at 468 (explaining that the *Heck* inquiry is not simply whether claims of excessive force are "intertwined" with the findings of the disciplinary board revoking his good time credits, but rather whether the plaintiff's claims are "strictly incompatible with the findings of the disciplinary board" that resulted in the loss of good time credits); *Santos*, 18 F.4th at 476–77 ("It is not sufficient to deem [the plaintiff's] claims to be 'intertwined' with his loss of good-time credits. Rather, in applying *Heck*, a court must bar only those claims that are 'necessarily at odds with' the disciplinary rulings, and only with those rulings that resulted in the loss of good time credits.").

---

[137] *Id.*

[138] *Id.* at 6.

[139] *Id.*

[140] *Id.* at 2–3.

Additionally, as explained, "there is no *Heck* bar if the alleged violation occurs 'after' the cessation of the plaintiff's misconduct that gave rise to his prior conviction." *Aucoin*, 958 F.3d at 382. The Nichols report states that "all use of force ceased" when Clark began to comply with the officers' instructions and Nichols released Clark's upper torso.[141] Accordingly, Clark argues that his allegations regarding Wallace's use of force through a chokehold and pushing him to the ground are not strictly inconsistent with the Nichols report for which Clark lost good time credit.[142]

However, as defendants point out,[143] they are not arguing that Clark's claims are "intertwined" with his loss of good time credits. As explained, defendants note that Clark's claim "is not that the officers used excessive force after he stopped resisting or to stop his resistance; instead his claim is based on assertions that he was ill and only trying to seek help from the officer on duty when several other officers, including [ ] Wallace, suddenly began using excessive force without provocation."[144] Indeed, Clark's petition alleges that he "began to feel very badly" and that he was only asking an officer to see a doctor when that officer "grabbed him and forced him against the wall."[145] Clark also alleges that other officers arrived to assist in escorting Clark out of the dormitory, that one of those officers "threw him on a bed" and that Wallace twisted his ankle, choked him, pushed him, forced him to the ground

---

[141] R. Doc. No. 18-3, at 5.
[142] R. Doc. No. 20, at 4–8.
[143] R. Doc. No. 21, at 4–5.
[144] R. Doc. No. 18-2, at 10.
[145] R. Doc. No. 2-1, ¶¶ 8–11.

because Clark was having difficulty walking due to his illness and pain, and grabbed his arm to jerk him up while using profanity.[146]

These allegations are inconsistent with the Nichols report, which states that Clark was being combative with Kimball, disregarded "loud, direct orders to stop resisting[,]" and continued to resist after he was handcuffed.[147] This prompted Nichols to direct Clark to the bed while giving additional orders to stop resisting.[148] The Nichols report also states: "Shortly afterwards, [] Clark began to comply with orders and [Nichols] released [] Clark's upper torso. At this point, all use of force ceased. All [o]fficers were examined by [a nurse] with no injuries to note."[149]

As noted, the Nichols report indicates that Clark pleaded guilty to violations of Rule 3 (defiance) and Rule 5 (aggravated disobedience), for which he lost good time credit.[150] Defiance is "obstruct[ing], resist[ing], distract[ing], or attempt[ing] to elude staff in the performance of their duties."[151] Aggravated disobedience is failing to "obey direct verbal orders cooperatively and promptly" and "debat[ing], argu[ing] or ignor[ing] orders before obeying."[152]

Like the plaintiff in *Aucoin*, Clark "has insisted . . . that he is wholly blameless for the use of force against him." *Aucoin*, 958 F.3d at 383. "If the factual account of [Clark's] complaint is taken as true, then he cannot be guilty of defiance [or]

---

[146] Id. ¶¶ 12–16.
[147] R. Doc. No. 18-3, at 5.
[148] *Id.*
[149] *Id.*
[150] *Id.*
[151] R. Doc. No. 18-6, at 22.
[152] *Id.*

aggravated disobedience." *Id.* "[W]hen a plaintiff's claim 'is based solely on his assertions that he . . . did nothing wrong, and was attacked by the [ ] officers for no reason,' that suit 'squarely challenges the factual determination that underlies his conviction' and is necessarily at odds with the conviction." *Id.* (quoting *Walker v. Munsell*, 281 F. App'x 388, 390 (5th Cir. 2008) (per curiam)); *see also McIntosh v. Goings*, No. 21-1719, 2022 WL 1091278, at *6–8 (E.D. La. Apr. 12, 2022) (Africk, J.) , (granting motion for summary judgment pursuant to *Heck* where the plaintiff's complaint turned on a single narrative inconsistent with the disciplinary board's determination that he was attacked without provocation).

The Fifth Circuit has previously explained that, where an excessive force claim "is presented as a single violent encounter throughout which [a defendant] used excessive force" and where the plaintiff asserts that he is innocent, contradicting an element of his previous conviction, the plaintiff's excessive force claim is *Heck*-barred. *DeLeon*, 488 F.3d at 656–657. This is so even if the plaintiff argues that "his conviction would not be invalidated by his proving that excessive force was used well after the need for it had ceased." *Id.* As discussed, Clark's excessive force claim is presented as a single violent encounter throughout which Wallace used excessive force. *See id.*[153] The video supports the assertion that the incident was a single violent

---

[153] Clark's claim is therefore distinguishable from *Bourne v. Gunnels* and *Gray v. White. Bourne* involved a prisoner who had jammed the food-tray slot in his cell with a sheet and towels and refused to clear it, requiring prison staff to use a chemical agent to regain control of the door. 921 F.3d 484, 487–88 (5th Cir. 2019). In his civil case, the prisoner alleged that, once the officers entered his cell and he was handcuffed and shackled on his cell's floor, certain officers used excessive force by physically and sexually assaulting him. *Id.* at 488. The prisoner was convicted of

encounter that occurred within the span of a few minutes. And the assertions in Clark's petition—that he was simply ill and seeking medical assistance when the officers began using force against him—belie his guilty pleas for defiance and aggravated disobedience. *See id.* Those guilty pleas required him to accept responsibility for resisting staff in the performance of their duties and for failing to

---

tampering with his cell door and creating a disturbance in connection with the use of force, resulting in a forfeiture of thirty days' good-time credit. *Id.* at 491. The Fifth Circuit held that the basis of the prisoner's § 1983 excessive force claims was distinct from the basis of his disciplinary conviction because it was separate from his jamming the food-tray slot and requiring the use of force by prison officials. *Id.* Specifically, "[a] finding of excessive force [after the officers had successfully entered the prisoner's cell and the prisoner was handcuffed and on the ground] would not negate the prison's finding that the prisoner violated its policies [by jamming the food-tray slot] and was subject to disciplinary action as a result." *Id.* By contrast, Clark's petition asserts that he was simply sick and seeking medical care when officers used force against him. As explained, that assertion is inconsistent with the guilty pleas for defiance and aggravated disobedience. In *Gray*, a prisoner alleged that certain officers attacked him in his cell, then took him to a shower and sprayed him in the face with a chemical agent despite his compliance with all orders. 18 F.4th at 466. The officers instead claimed that they approached the prisoner's cell for a targeted search because the prisoner was evidently intoxicated, and that they moved him to the shower area, where he refused direct verbal orders and assaulted them, forcing them to use the chemical agent to gain compliance. *Id.* The disciplinary board found the prisoner guilty of one count of intoxication, two counts of defiance, four counts of aggravated disobedience, and one count of property destruction. *Id.* The board issued multiple disciplinary sanctions without stating which of its findings were necessary to the prisoner's convictions, and the district court had not yet performed a fact-specific analysis informed by the elements necessary to establish those violations. *Id.* at 466, 467. Accordingly, the Fifth Circuit ultimately concluded that it could not determine which of the prisoner's factual allegations might necessarily contradict his disciplinary convictions. *Id.* at 470. Conversely, Clark's claims arise from a single encounter captured on video and defendants have provided the Louisiana Department of Public Safety and Corrections Disciplinary Rules and Procedures for Adult Offenders, which state the elements of defiance and aggravated disobedience. *See* R. Doc. No. 18-6, at 22.

obey direct verbal orders cooperatively and promptly.[154] Accordingly, Clark's § 1983 claim is barred pursuant to *Heck*.

### c.    State-Law Claims

Because the Court has concluded that Clark's § 1983 claim is barred, only his state-law claims remain. A district court may decline to exercise supplemental jurisdiction over a state-law claim if "the district court has dismissed all other claims over which the district court has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). A district court has "wide discretion" when deciding whether it should retain jurisdiction over state-law claims once all federal claims have been eliminated. *Guzzino v. Felterman*, 191 F.3d 588, 595 (5th Cir. 1999). However, the general rule in the Fifth Circuit is "to dismiss state claims when the federal claims to which they are pendent are dismissed." *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992). In addition, the Fifth Circuit has instructed district courts to consider the common law factors of "judicial economy, convenience, fairness, and comity." *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008). "These interests are to be considered on a case-by-case basis, and no single factor is dispositive." *Id.*

Upon review, the Court concludes that Clark's state-law claims should be remanded to state court. The Court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Moreover, allowing Louisiana courts to rule on Louisiana law "encourages fairness between the parties by 'procuring for them a surer-footed reading of applicable law.'" *Bitte v. EMC Mortgage Corp.*, No. 07-9273,

---

[154] *See* R. Doc. No. 18-6, at 22.

2009 WL 1950911, at *2 (E.D. La. July 1, 2009) (Africk, J.) (citations omitted) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). "[D]eference in this case with respect to the state law issue[s] promotes the important interest of comity to state courts." *Id.* The Court therefore declines to exercise supplemental jurisdiction over the remaining state-law claims. Those claims will be remanded to state court.

### d.     Leave to Amend

Finally, Clark argues that, to the extent the petition "does not closely describe the conduct of Wallace shown in the video," the Court should allow Clark an opportunity to amend his complaint.[155] According to Clark, "[i]t is obvious from the video that while Clark was face down on the bed with Nichols on his back, [Clark] could not clearly see who was doing what."[156] Clark asserts that the video was recently produced and that an amendment would "cure any possible overlap between the disciplinary charges by Nichols and the attempts by Wallace to detach the leg at either the knee or the hip[.]"[157] Specifically, Clark argues that the moment he was "let up by Nichols is when Nichols says all resistance by Clark ended."[158]

Federal Rule of Civil Procedure 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Although Rule 15 "evinces a bias in favor of granting leave to amend," it is not automatic. *Martin's Herend Imps., Inc. v. Diamond & Gem Trading U.S.A. Co.*, 195 F.3d 765, 770 (5th

---

[155] R. Doc. No. 20, at 9.
[156] *Id.*
[157] *Id.*
[158] *Id.*

Cir. 1999); *United States ex rel. Lin v. Mayfield*, 773 F. App'x 789, 790 (5th Cir. 2019) (quotations omitted). A decision to grant leave to amend is within the discretion of the trial court. *Mayfield*, 773 F. App'x at 790.

However, a "district court must possess a 'substantial reason' to deny a request for leave to amend." *Id.* (quoting *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004)). The "futility of the amendment" is one such reason. *Id.* "[A]n amended complaint is futile 'if the complaint as amended would be subject to dismissal.'" *Rohi v. Brewer (In re ABC Dentistry, P.A.)*, 978 F.3d 323, 325 (5th Cir. 2020) (quoting *Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014)). Futility is evaluated "under the same standards as a dismissal under Rule 12(b)(6)." *Butler v. Denka Performance Elastomer, L.L.C.*, 16 F.4th 427, 437 (5th Cir. 2021) (citing *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016)).

As discussed, the problem with Clark's petition is that he asserts he was merely seeking medical treatment when Kimball began to use force against him and that other officers arrived and also used force against him. The same is true of Clark's Administrative Remedy Procedure claim, which states that Clark was sick and simply attempting to communicate his illness to the officers when they used force against him.[159] Pursuant to *Aucoin* and *DeLeon*, the fact that Clark maintains he did nothing wrong indicates that his petition is inconsistent with his guilty pleas for defiance and aggravated disobedience in connection with the Nichols report.

---

[159] R. Doc. No. 18-4, at 14–17.

Accordingly, the Court finds that permitting Clark to amend his petition to match the video more closely with respect to the sequence of events would be futile.

## VI.   CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** to the extent it seeks dismissal with prejudice of Clark's § 1983 claim. The motion is **DENIED** to the extent it seeks dismissal with prejudice of Clark's state-law claims.

**IT IS FURTHER ORDERED** that Clark's federal claims against defendants are **DISMISSED WITH PREJUDICE** to their being asserted again until the *Heck* conditions are met.

**IT IS FURTHER ORDERED** that Clark's state-law claims are **REMANDED** to the 22nd Judicial District Court in Washington Parish, Louisiana for further proceedings.

New Orleans, Louisiana, March 8, 2024.

_____
LANCE M. AFRICK
**UNITED STATES DISTRICT JUDGE**